Good morning, your honors. Eric Slepian on behalf of John Ross. Your honors, this case involved a long-term disability dispute. Mr. Ross was a vice president and chief operation officer, and unfortunately he suffered from a number of medical impairments. Help me on a detail of what happened procedurally. As I understand it, the Hartford had reports, it obtained reports from independent medical examiners. Were those shared with you during the procedure before the Hartford? I'm not asking now about during the district court procedure. No, those reports were not shared with Mr. Ross. At that time, Mr. Ross was not represented by counsel. Did he request the reports? I don't know the answer to that. I do know he would call them to find out the status fairly frequently. I don't know what was said over the telephone. It was unrepresented. The reports were not shared with him, and we don't know if he asked for them or not. Correct. Okay. And those reports, were they the result of just reading the file, or were independent medical examinations done? They were strictly reading the file. Thanks. And I would like to point out a couple of things that's noteworthy in those reports. For one, the examiner who did the orthopedic evaluation, Dr. Pick, after reviewing the record, he noted that Mr. Ross has difficulty with his gait, swinging his foot out. He's got an encapsulated nerve root documented by MRI evidence, and he's got fecal incontinence that's happening almost on a daily basis. And that particular physician writes that he does not believe Mr. Ross can lift or carry more than 10 pounds in a work setting. Now, we have a description from the employer saying that Mr. Ross's work required him to be on his feet for six hours a day, as well as lifting up to 20 pounds. So even if we look at portions of that report, it would indicate that Mr. Ross was unable to perform his job as a COO. Counsel, a lot of these health problems, though, he had since 2001. Correct? Yes. He's had a number of problems since 2001. And he was still able to perform the duties of his job, as I understand it, in 2001. What happened in his conditions where he was no longer able to perform his job in 2004? Well, the record demonstrates that Mr. Ross was experiencing increased fatigue. He was experiencing chest pain. He had decreased energy, and that there was a reduction in his performance at work and outside of work. And so he went into treatment at the VA with a cardiologist, and the testing showed that he had critical aortic stenosis. Now, that was never a finding in this record prior to that particular date. I think it was made in April. Tell me about that critical aortic stenosis. It looked to me from the brief as though you were saying when they tried to do an echo, they had to stop it in the middle of the procedure because it was too dangerous on account of the stenosis. Is that correct? That is how the report reads. It said that they saw that it was at a critical stage, and they stopped the testing. Okay. What that would mean, if I understand it right, and you tell me if I do, you know more than I do about this, is that when they tried to do the echocardiogram, not enough blood was going to the heart, and there was a risk of a heart attack or brain damage if they continued the test to a conclusion. That is my understanding, Your Honor. So they did not continue the test to its conclusion. Correct. So they were going to follow up. So he had a heart insufficiency? Yes. Okay. And so they were going to do some. Stenosis means narrowing of the artery to the heart, right? Stenosis means a narrowing. Correct. So they were going to do some further testing to see if maybe there was a problem with the valve that was previously inserted. And the cardiologist determined that based upon the finding that there was critical aortic stenosis, no further testing would be warranted because this man needs a valve replacement. This is not an elective piece of surgery. I mean, this is a quite a. . . I know some people who've had that. I think one a calf valve and one a pig valve, and they work. Yes. Was he repairable so he could go back to work if he got a pig valve? Well, I guess, you know, one thing is going to be how successful. . . What did the doctor say? The doctor felt that with the valve replacement he may get to that point. But we don't have records saying that, yes, that in fact occurred. And I would point out that. . . Those were bum valves. They weren't stenosis. He had a bad valve. It was what they call a mismatched valve. So he had both the stenosis and the bad valve. I believe he had both. I cannot tell you that with absolute certainty from reading these medical records. What I'm getting at is whether he's repairable. I haven't read the records in the detail I'd like to yet. Right. The cardiologist's belief at the time was that he was repairable, and that's why they were recommending the valve replacement. And he had the valve replacement. He did, in fact, have the valve replacement. I had a question about the opinion from Dr. Tai. I think it was Dr. Tai who was the one doctor who said that he was disabled out of the group. Am I identifying him correctly? Dr. Tai is a cardiologist who's certified disability, but he's not the only one. Well, let me just ask the question about him. I didn't. My memory is that he said that, but did not give a specific reason for saying that Mr. Ross was completely unable to work or unable to perform the essential functions of his job as of a particular date in June. Did he give a reason that I've missed, or did he just give a conclusion? I believe Dr. Tai said that he was treating at the VA for cardiac problems and that the individual was unable to work. Without further explanation? That's my recollection, Your Honor. Okay. Did Dr. Tai not respond to inquiry to explain his opinion? That's hard to say. You know, the defendant alleges that they faxed over a report. Well, the other doctors say so, don't they? Dr. Pick says that he did not get a return call. And Dr. Podrud? And Dr. Podrud says they did not get a return phone call. You know, one of the things, we can't look at this in isolation. These are doctors that are working at the Veterans Administration, and it's really not their job to pick up the phone and talk to somebody about their patient's medical condition, especially if they don't know who it is on the other end. Except that it's really, I'm sorry, Judge Kleinfeld, I'm just going to say, isn't it usual that doctors take calls from other doctors, even if they don't know them by name? You know, Dr. Jones, this is Dr. Smith calling. I mean, with repeated phone calls, which is what these other physicians have said. I imagine in the private practice it is. I do not know how it works in the Veterans Administration. I know that their procedures are quite different. Do you think their procedures preclude them from answering phone calls? I do not believe that it would preclude them from answering phone calls, Your Honor. I don't know if they get to their phone calls within five days. Is there any law on this? I've been disturbed by it in several cases, including this one. You get a case. It's got, I think this one has the standard structural conflict of interest because the Hartford's paying out its own money, so under a baddie that's a factor, and under that recent Supreme Court decision. And a big issue is doctor didn't respond. But, gosh, when I did personal injury work, sometimes the doctors were helpful and sometimes they weren't, and there wasn't much that a third party could do about it. Is there any law on what happens to the claim because of the doctor? You get a Kaiser Permanente doctor or, worse yet, a VA doctor. They love to define things. It's not their job. In terms of the law on that issue, Hartford has been admonished for giving this five-day deadline. I didn't note any long-term disability cases, but Social Security law does recognize it. I would think that if I got the letters from somebody I didn't have an obligation to deal with and it said, you have a five-day deadline, I'd get mad and throw the letter away. I would agree with you, Your Honor. What did the medical records show about your client's condition following the valve replacement? Well, unfortunately, we don't really get into that. But his orthopedic impairments will not improve, ever. They're permanent. And what's interesting in this case is that if we accept their orthopedic doctor's opinion, the claimant can't do his job as he performed it. So it's a question then of whether he could do his occupation as it's performed in the economy. And if you look at defendants' reports, they say to Mr. Ross, you found a, quote, accommodation, end quote, that will allow you to work with your impairment. Well, counsel, let me just say that I'm speaking obviously only for myself, but the thing that most concerns me about your side of this case is that in Mr. Ross's application for these benefits, he said that he had been experiencing all of the things that were bothering him at least since 1999, and it's a little unclear, maybe even 1989, during which he had been performing not only the essential functions, but apparently all the functions of his position. And I think that, for me, is the most difficult part of this case. Well, Your Honor, if we're talking about a worsening of his condition, he was complaining of the increased fatigue. Defendant's cardiologist says, and I'm paraphrasing, but it's close to an actual quote, based upon his mismatched aortic valve, his complaints of fatigue is justifiable. It's explained by these medical records. And so, you know, when you have a situation where you have a degenerative process going on, it's hard to look at somebody on one day and then look at the next day and say what changed when it progresses throughout his time. You know, Mr. Ross's mind, you know, yeah, I'm still in pain. I have been in pain. You know, pain's getting worse. The fatigue's getting worse, but I've had these problems for a while. That doesn't mean that he can continue to work with those problems. You know, Mr. Ross is hanging on by a thread this entire period of time, and his back pain's increasing. He's developing some psychological reaction to this. He's told that he needs an aortic valve replacement again. He has increased fatigue, increased chest pain, and it's all objectively verifiable. And one thing that's not in this policy is a requirement that he show worsening. I didn't really understand that, no change for patient doing well notes. Was there any context to show whether that meant there's no change from a really bad condition or no change from a condition that's not so bad or doing well relative to being dead or doing well relative to being able to function well? Right. And the short answer is there's no real explanation to that term, quote, doing well. But if you look at those subjective complaints, he says, yes, I've had this for quite some time, but it is getting worse. I'm having my daily chest pain. I'm having my increased fatigue. And he didn't have that, hey, you need a valve replacement. What is the insurance company to do when there are medical reports indicating that the person really is disabled, but there's some reason to doubt them and they just can't get the doctors on the phone or get a letter from them? Well, one thing they probably should have, and probably they should have sent Mr. Ross for an independent medical examination. Put him on the table. Take a look at him. See how he's feeling. See if his complaints are appropriate. Case law says that, you know, them not doing that is a factor. And, you know, in this particular case. Which case are you thinking of? I know it's cited in my reply brief. That's okay. Okay. You know, and they look at these various factors. And one of the important issues in this case is Mr. Ross was denied based on summary judgment. And these facts are supposed to be interpreted in his interest. And he's supposed to be given the benefit of the doubt. The district court applies. Well, he is at one level, but the courts don't really have, I mean, I know you're arguing this, but if we don't have de novo review, or the courts in general don't have de novo review of the Hartford's decision, but only abusive discretion review, then there may be, it may not help you to look at it in the light most favorable to you. It's a little bit different than a de novo case. Well, there are two separate issues here. And one is, should the district court have reviewed this, you know, with an arbitrary appraisal standard? Yeah, I understand that. And, you know, there are lots of factors of conflict here. Yeah, but if we don't agree with you on that, then I'm not sure that the summary judgment standard of looking at it in your favor gets you all the way home, because it's still only against an abusive discretion review standard. I think it's kind of open and shut under Abadi and the recent Supreme Court decision that it's abusive discretion review with extra skepticism because of the conflict, isn't it? Yes. And here there was no, if you look at the district court's decision, they say we're applying an abusive discretion review without allowing Mr. Ross to obtain the discovery that he tried to obtain of additional evidence of that conflict. You mean the claims handling manual? That and depositions and information about who's doing these reviews. The case law shows us that these reviews are done by a disability outfit whose only client is Hartford and that they have an incentive to deny claims. And the case law, they look at that as a factor as well. And that's the type of information that Mr. Ross was trying to obtain. Counsel, you've exceeded your time, but we'll restore a little bit for rebuttal. Thank you. Thank you. May it please the Court. Counsel, my name is Lawrence Kast and I represent the appellees. I think I wrote down six specific areas that the Court was interested about that I'll try to respond to. The halted echocardiogram, the law regarding doctors who won't respond to inquiries from the insurance company, the notion whether or not the VA responded here, which it did, the records that exist after the post-work valve replacement, the question of what do we require a change from, and also whether or not Mr. Ross should have had an IME. First, let me talk about the echocardiogram. The halted echo that the Court asked about occurred in 2001, and it was the basis for the first valve replacement. He received a bovine valve replacement. After that valve replacement, he went to work and worked for three years, more than three years. He then leaves work in June of 2004, and two months later his doctors decide, I think many of your symptoms are caused by the fact that we didn't do a good heart valve replacement. We're going to try a porcine, a pig valve, which he then received. With respect to what records exist after the valve was replaced, the VA did respond. Dr. Goldman's nurse practitioner, Nurse Brining, I believe was her name, said that although the second valve replacement had been temporarily disabling, Mr. Ross was cleared to return to work a couple of months, a couple of weeks later. And the items, let me cite the Court to the portions of the record where that occurs. That would be, that's both in a phone call to the Hartford at excerpts page 73 and in a written note. And what happened is after Dr. Goldman wouldn't respond to the VA's many phone calls, they finally sent a letter. And Nurse Brining writes on the letter in response to the Hartford, and that's at excerpts page 162, that he could return to work in November. Dr. Tye said the very same thing. What happens with Dr. Tye is he fills out something called an attending physician statement. Mr. Ross sends that to the Hartford eight months after he leaves work. The attending physician statement identified most of the symptoms related to the valve replacement as the basis for the disability. And even Dr. Tye returned Mr. Ross to work as of late 2004, cleared him to return. That's page 138 of the record. The law regarding whether a doctor must, whether doctors must respond in a disability case. I think the Court's question was what the effect of a BOTI is on that question. Not exactly. My concern was the insurance company is in a difficult position when a doctor just checks a box or something saying patient can't work or just writes in conclusory language patient can't work. And they want to talk to him and say why, and he won't respond. Well, he doesn't have much of an incentive to respond. He can say not my job, I just treat patients, I don't do lawsuits, and no one has any control over him. So on the one hand, the insurance company's got a problem. On the other hand, the claimant's got a problem. And I don't know quite where the burden of that falls. I think the burden first falls on the company. The claimant can't control VA doctors. That's right. Kaiser Permanente or most others. I think the burden first falls on the company to make a decision what the other medical evidence they have shows before they decide do I need to speak with this doctor. In this case, you have very specific plan language that says a total disability means you are prevented from performing the essential functions of your job. All the evidence before the Hartford was that Mr. Ross had been working with these same conditions for many years. I think in that case it was reasonable for them to do follow-up with the doctors. But this Court actually, in a preabate case, has held that the doctor's refusal to return phone calls or respond is something that a plan administrator can take into account in the decision. That's the Nord case, which is actually the opinion on remand after the case came down. And I wish I had the citation. Well, as I recall the facts of that case, the record did not make out a particularly significant case for disability. And that doctor said in conclusory language or in a checkbox that he was disabled and that they kept calling and saying why, and he wouldn't respond to the call. He wouldn't respond. But here also, Dr. Goldman didn't respond, but the VA did respond. And those were those record citations I gave the Court a little bit earlier. Follow-up, follow-up, follow-up with Dr. Goldman. He won't respond. Finally, the Hartford gets his nurse practitioner on the phone, and she sends back that – she actually took the letter the Hartford had sent to Dr. Goldman, writes on it that his disability was caused not by the conditions that he'd had before, but by the surgery, the second valve replacement surgery that occurred after he left work, and then clears him to return to work as of November 2004. Let me be sure that I understand your position. It is that we don't have to reach for the law concerning refusals to respond, because ultimately there was an explanation from the different medical sources. I think that's probably – I don't know that this case is an opportunity to reach any per se or grand rules about the failure to respond. I'm not sure that I – oh, sorry, go ahead. Please, Your Honor. No, I'm here to answer questions. I'm not sure that I read what that nurse practitioner wrote the same as you do. I'm looking at ER 162, and it says he was AVR 10-15-04, discharge 10-19-04, six-week restriction, no driving and so forth, return to work anticipated, 11-29, 20-pound lifting restriction for additional four weeks. She's not saying that he can return to work. She's just saying it's anticipated. That's right. And the date that she writes on the letter is after – is in the future. It's a month from now. But there's nothing in the record to indicate that that was a faulty conclusion. Is there anything in the record to say he can work, other than the doctors who did not examine him? I don't believe so. Although one other piece of evidence, the attending physician statement that Dr. Tai completes, which he completed again before the date that it was thought that Mr. Ross could return to work, was submitted to the Hartford after that return to work date. So he has his surgery in October 2004. Dr. Tai at that point fills out the attending physician statement and talks about an anticipated return to work in, he thought, December of 04. When he writes it, it's in the future. But that form is submitted to the Hartford in March of 05. And there's no other evidence in the record to indicate that those hopeful projections were incorrect. If I could get back, though, to the basic inquiry. I think Judge Sedgwick's 26-page opinion below was thorough and well-reasoned, and the Court analyzed the medical evidence. If I could talk just a little bit about the affirmative pieces of medical evidence in the record that I think support the administrator's decision, I'd like to. Ten days before he left work, Mr. Ross visited a cardiology fellow at the VA and said he was, quote, doing well overall. The cardiology fellow also said that Mr. Ross was doing well. That's what led to my question. Doing well is relative. With the things wrong with him, doing well can mean you're functioning. Yeah. Or it could mean you're fine for work and generally you can get along. Or it could mean, gee, you're not dying. That's great with as bad a heart problem as you have. That's right. But the cardiology fellow also said he reports no significant problems recently. And it's not just the words. It's the words coupled with the fact that he'd been working with these very same medical conditions for a period of three years. And I don't think that Hartford was asking for magic words here. I think a couple of statements by the doctors would have made this a different case. I think if a doctor had come forward and said, as Mr. Slepian did, but I don't think it's in the records, that these – that though he's had these conditions for many years, they're cumulative or they're degenerative. And then a doctor had gone on to simply say, here's how they reached critical mass and prevented him from working on June 18th, 2004, even though they had not for years before. I think it would be a much different case. There's nothing in there about any of this being progressive? Not to my knowledge. I mean, I'm not a physician. There may be key words in there that would clue a physician in to the question whether it was or wasn't. But it looked mostly static. I mean, the orthopedic condition that we're talking about, the herniated disc, I think it's a herniated disc. He'd suffered in 1978 and had two surgeries in 1989 and 1999 and clearly had been able to work. And I'm not standing before the Court saying that there are not sometimes people that can gut it out and go to work, even though they're not actually able to work. And they might be disabled when they ultimately decide to leave. I think that's possible. I don't think the Court needs to decide that in this case. I think what I'm saying is that we're talking about a period of four years where Mr. Ross was working at a high-level job. So it was not a case where he was just going to work but not doing the work. And the plan at issue here says you must be prevented from doing the essential duties of your occupation. And I think a fair reading of the medical record and the claims handling history indicates exactly what the Hartford was doing. Help me on another issue so we won't run out of time on it. Yes. The discovery issue. For the conflict, it's established that Hartford would be paying out its own money. So you've got that. Structural conflict. Absolutely, Your Honor. We have a decision. I believe our chief judge wrote it. And it talks about conflict not just ‑‑ I can't remember the name. Not just in terms of that but also in terms of a history of not paying claims that ought to be paid and a process of denying claims. And my response, as I thought about it when I read that decision, was, gee, I guess you need discovery then of history and the claims manual to see if the claims manual says turn down marginal claims, turn down all chronic fatigue syndrome claims, turn down if there's no worsening and the person has been working, whatever the procedure may be. Or it may say give a fair consideration of claims and then lay that out in more detail. And I think that's one of the issues on appeal, that discovery should have been allowed on that. Why isn't that so, considering that we've made claims handling history and procedures generally and not just in the individual case factors to consider in the conflict? I think it's extremely important to understand why discovery was denied by Judge Sedgwick. It was not based on any ruling about what is or isn't allowed under ERISA. It wasn't based on interpretation of the Abbati case or anything like that. He denied discovery for the simple reason that Mr. Ross had missed his discovery cutoff deadline. So all it is is deadline, discretion to enforce a deadline. Absolutely. And this Court's repeatedly determined that that kind of decision on appeal gets not just abusive discretion, but for obvious reasons when it's an issue about docket control. That kind of decision is given very wide berth when a trial court makes a ruling. And I'd urge the Court, if it wants to see exactly why Judge Sedgwick denied discovery, to look at the order, which is at 443 to 449 of the excerpts. And even after that order, Your Honor, Judge Sedgwick also went on to say, look, if you really thought you needed other information, the claims manual, something else like that, you should have filed a Rule 56F affidavit in response to the motion for summary judgment, which you clearly could have done, to show me here's what I would have liked to have shown. Interestingly, with respect to the denial of discovery, Mr. Ross didn't even give the district court a chance to exercise its discretion to give him time, more time under the discovery rules. He didn't come forward and say, oh, it was excusable neglect, there's good cause here. He blamed it all on the Hartford. And his essential position was, you should have answered my untimely discovery. And the Hartford, I think, rightly said. That raises one more question I had for you. I'm wondering whether the Hartford had a duty to provide the claimant and his physicians with its own reviewing physicians' reports to the Hartford so that they could consider and respond to them. I think we have some case law suggesting that. I would respectfully suggest that I think the case law goes the other way and indicates that we don't want an interminable give and take under the ---- There's a statutory give and take that's supposed to occur between the initial denial and the final denial. Yes. But I would refer the Court to the Silver case in a very lengthy footnote, too. The issue there was slightly different. It was whether the Hartford should be precluded from introducing evidence below because it hadn't given the claimant the opportunity to review it during the claim handling process. And the Court said no. ERISA requires a reasonably prompt decision. We're not going to require every piece of paper to have to go to the insured for review. My time is about to expire. May I address the IME issue just briefly? Yes. With respect to the question whether an IME is necessarily required, I'd note that whatever the Court might think about that issue, this isn't the right case to decide it. Mr. Ross did not argue below that he should have been given an IME. It nowhere appears in his opposition to the motion for summary judgment. Unless the Court has further questions, thank you for the extra time. Thank you, counsel. You used all your time, but we'll give you a minute for rebuttal since everybody seems to be going over their time this morning with interesting things to say, so. Thank you, Your Honor. First, I want to point out on page 182 of the transcript, we have the results of the echocardiogram. The report is dated August 2nd, 2004, and it says the test was done August 2nd, 2004, and it says the final impression is, and I'm quoting, significant evidence of critical aortic stenosis with doubling of MTVG with low dose of dabutamine. All walls appear to contract normally. Study stopped early due to evidence of critical AS. Patient needs cardiac cath to evaluate. Redo AVR. And that's prior to the second surgery. This is in 2000. Mr. Ross became. This is prior to the second surgery. This is prior to the second surgery. Right. This is what made them do that second surgery, because if you read, they were then going to send him out for a cardiac cath, and they said, you know what, based on how bad this test is, we're just going to go replace your valve. You have no choice. So when counsel said that it happened years ago, that's incorrect. Thank you, counsel. We appreciate the helpful arguments of both counsel. The case just argued is submitted.
judges: Carney, Kleinfeld, Graber